ABBEY SPANIER RODD & ABRAMS, LLP
Karin E. Fisch
Orin Kurtz
212 East 39th Street
New York, New York 10016
(212) 889-3700

MCLAUGHLIN & STERN, LLP
Alan E. Sash (AS-8804)
Steven J. Hyman
260 Madison Avenue
New York, New York 10016
(212) 448-1100

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEFFREY MARCUS, Individually and On Behalf Of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND** |
| BMW OF NORTH AMERICA, LLC, and BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC, | |
| Defendants. | |

Plaintiff Jeffrey Marcus ("Plaintiff"), by and through his undersigned attorneys, alleges as follows:

## INTRODUCTION

1.      Plaintiff brings this action on behalf of a nationwide class under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, and a New Jersey state law subclass of consumers who purchased or leased any 2006, 2007, 2008 or 2009 BMW (the "Vehicles") that came equipped with Bridgestone run-flat tires (the "Tires") and whose tires had to be replaced after going flat.

2.      Run-flat tires are a purported safety innovation over radial tires, which have been the standard on nearly all automobiles sold in the U.S. since the 1960s. The Tires allow a driver to continue on for up to fifty miles at fifty miles per hour after losing all or substantially all air. The Tires, however, are defective and are prone to pop, bubble or otherwise fail from the smallest bumps on a normal road, and they do so often. As alleged below, drivers whose cars are equipped with the Tires suffer alarmingly frequent instances of flat tires in a short period of time—a problem that did not exist with radial tires.

3.      Not only are the Tires overly fragile and prone to pop, but they are also susceptible to other catastrophic failures that were not an issue with radial tires. The Tires cannot be repaired in the event of a small puncture such as a nail which, with a radial tire, would cost about $15 to repair. Thus the Tires must be replaced at a price of approximately $400 *per tire* in the event of a puncture.

4.      Once a driver purchases a car equipped with the Tires, he or she must use the Tires forever. A car equipped with the Tires cannot be converted to use radial tires for several reasons including, *inter alia*, that cars equipped with the Tires do not have space for a spare tire,

and, on information and belief, the suspension of a car equipped with the Tires is specially engineered for use with the unique (and horribly stiff) handling characteristics of the Tires. Thus, a driver must pay approximately $400 to replace tires that are prone to, and frequently do, suffer terminal failures and require replacement.

5.    Adding further difficulty, only certain repair shops—usually car dealerships—have the expensive equipment that is required to replace a Tire. Many service stations do not sell or fit the Tires on cars. So, if a driver suffers a flat more than fifty miles from a dealership, the driver is unable to get his or her vehicle to the location for a repair and does not have a spare tire (not even a space-saving "donut") to reach the dealer. The driver is stuck until a tow truck comes or until a Tire arrives at a nearby dealer.

6.    As alleged herein, Defendants BMW of North America, LLC ("BMW") and Bridgestone Firestone North American Tire, LLC ("Bridgestone") were fully aware of the defects in the Tires, and were fully aware of their exorbitant cost when the Vehicles were sold or leased to Plaintiff and the Class. Yet, Defendants failed to disclose the defects to Plaintiff and the Class when they purchased or leased the Vehicles.

7.    None of the problems alleged herein existed with radial tires, and Plaintiff and the Class had no reason to believe that these problems would exist with the Tires—indeed, to the average automobile purchaser or lessee, tires are nothing more than an afterthought. Thus, having superior knowledge, Defendants had a duty to disclose the truth about the Tires to Plaintiff and the Class.

8.    Had Plaintiff known that the Vehicle he leased was equipped with the Tires, and had he known that the Tires were defective and exorbitantly priced, Plaintiff would never have entered into an agreement to lease the Vehicle.

2

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Diversity exists because Plaintiff is a New York resident, while BMW is a Delaware limited liability company located in New Jersey, and Bridgestone is a Delaware limited liability company located in Nashville, Tennessee.

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391, because Defendants do business in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Moreover, Defendant BMW's principal place of business is located in this District and Defendant Bridgestone conducts substantial business in this District.

## THE PARTIES

11.     Plaintiff Jeffrey Marcus ("Plaintiff") is a resident of New York City.  On July 9, 2007, Plaintiff leased a new 2007 BMW 328ci convertible from Prestige BMW, an authorized BMW dealership located in Ramsey, New Jersey.

12.     Defendant BMW is a Delaware limited liability company with its principal place of business in and North American headquarters located in Woodcliff Lake, New Jersey.  BMW maintains corporate offices and a training center in Montvale, New Jersey, a parts distribution center in Mount Olive, New Jersey and a Vehicle Preparation Center in Port Jersey. BMW does business throughout New Jersey, including throughout this judicial district. Upon information and belief, all corporate decisions regarding the Vehicle, the use and placement of Tires on the

Vehicles, the applicable technical service bulletins, and the representations and acts of concealment which are the subject of this lawsuit were directed by, or emanated from, BMW representatives working in New Jersey or directly reporting to superiors situated in New Jersey.

13.    BMW Financial Services NA, LLC ("BMW Financial") is a subsidiary of BMW. BMW Financial has administrative offices in Woodcliff Lake, New Jersey, and one of its regional offices is located in Montvale, New Jersey. BMW Financial offers leasing services, and claims to be "a leader in innovation and customer service in the automotive industry." On information and belief, BMW Financial was the drafter of Plaintiff's lease.

14.    Defendant Bridgestone is a Delaware limited liability company with its principal place of business in Nashville, Tennessee. Bridgestone designs, manufactures, markets and sells the Tires. Bridgestone does a significant amount of business in New Jersey including, but not limited to, marketing, selling, and supplying BMW with the Tires.

## BACKGROUND

15.    Since the 1960s, radial tires have been the standard for nearly all cars sold in the United States. Radial tires are made from layers of rubber and cord (made of steel, polyester, and recently, kevlar), as well as belts that are oriented along the direction of travel. Until recently, with very few exceptions—such as various Porsches, Lamborghinis and other exotics—all cars were sold with radial tires.

16.    Cars sold with radial tires come with a spare, which can be stored in the trunk or, on some cars or light trucks, either mounted on the outside rear of the vehicle or under the vehicle.

17.    Radial tires are fairly inexpensive and easy to replace. For example, a Bridgestone Potenza radial tire that would fit on a BMW 328i Coupe, if that car were compatible with radial

tires, would cost approximately $111. A Sumitomo radial tire that would fit on the same car sells for as low as $64.

18.    For the average car buyer or lessee, the tires and their attendant problems, if any, are not a factor considered when deciding whether to purchase a car. This is due in part to the fact that radial tires require little maintenance and hassle—if a tire goes flat, it is either repaired or replaced for a reasonable price.

19.    Although run-flats have been placed on certain exotic cars for many years, run-flat tires were rarely used on "everyday" cars until approximately six years ago. Even today, the vast majority of cars sold in the United States use radial tires, and not run-flats.

**Description of Run-Flat Tires**

20.    A run-flat tire is designed to resist the effects of deflation when punctured, and to allow the driver of the vehicle to continue on for 50 miles at a speed of 50 miles per hour after loss of air pressure. There are generally three run-flat technologies: self-supporting tires, which have thickened side walls that will hold the vehicle up in the event of deflation; self-sealing tires, which contain an extra, self-repairing lining inside the tire; and auxiliary-supported tires, where an additional support ring is attached to the wheel and can support the vehicle in the event of loss of pressure. Bridgestone run-flat Tires are self-supporting tires.

21.    According to Defendant Bridgestone's web site, run-flat tires have several purported benefits. First, the purported safety benefit of run-flat tires is that a driver does not have to stop to change a flat tire on the side of the road; instead the driver may continue on to a service station and have the tire changed there.

22.    Bridgestone's web site also states that run-flat tires allow vehicle space to "be utilized more efficiently by eliminating the need for a spare tire."

5

23.    Bridgestone also touts the environmental benefit that a run-flat Tire conserves natural resources because there is no need to manufacture a spare tire.

24.    Bridgestone does not disclose the fact that the Tires are prone to deflate, pop or sustain bubbles from driving on a normal street, and cannot be repaired for even a small puncture, thus negating all of the above purported benefits of equipping the Vehicles with the Tires. Bridgestone also fails to disclose that few service stations stock or service run-flat tires. Thus, if a Tire loses pressure more than fifty miles from a location that sells run-flats, the driver is stuck without a spare.

**The BMW Tire Pressure Monitoring System**

25.    Because of the thickened sidewalls on a Tire, a driver has no way of knowing whether the Tire has lost air pressure. The Tire does not look flat upon a visual inspection because the walls of the Tire hold the car up, even without air. Accordingly, the Vehicles are equipped with Tire Pressure Monitoring Systems ("TPMS"). The TPMS has two types of warnings. First, a low pressure light (the "Low Pressure Light") comes on to let a driver know that the Tire has low air pressure. A second light (the "Total Loss Light") comes on to let the driver know that the Tire has lost all or substantially all air pressure.

26.    The TPMS, however, is flawed due to "false positive" alarms. The combination of the Tire's thickened sidewalls, which make it impossible to tell if a Tire is flat, and the TPMS, which is prone to false alarm, means that a BMW driver can never tell whether there is a true problem with his or her Tires and must take the car to a to be inspected every time the TPMS is triggered. When the Total Loss Light indicates a loss of pressure, a driver has no choice but to bring the Vehicle into a dealer immediately—the driver cannot tell whether a Tire is flat, cannot drive more than fifty miles on the potentially flat Tire, and does not have a spare tire as a backup.

**Plaintiff's Experience with the Vehicle and Tires**

27.    On July 9, 2007, Plaintiff entered into an agreement with Prestige BMW, a New Jersey dealership, to lease a 2007 BMW 328ci convertible. The duration of the lease is 36 months; thus the lease runs through July 9, 2010.

28.    Upon entering into the lease, Plaintiff was offered the option of purchasing tire insurance for approximately $700. On information and belief, the dealer offered Plaintiff tire insurance because it was known to the dealer—and Defendants herein—that the Tires are defective, prone to pop or bubble, and are extremely expensive to replace. As these facts were unknown to Plaintiff at the time, Plaintiff declined insurance coverage on the Tires.

29.    On August 17, 2007, just over one month after taking possession of the BMW, Plaintiff's Total Loss Light indicated a loss of all or substantially all air pressure. Plaintiff brought the BMW to BMW of Manhattan, Inc., an authorized BMW dealership in New York, New York, for servicing.

30.    Here, Plaintiff learned for the first time that the BMW was equipped with the Tires. Plaintiff also learned at this time that the Tires could not be "plugged," and had to be replaced, even in the event of a small puncture. Thus Plaintiff paid $385.55 to replace the Tire due to a nail puncture. A nail puncture on a radial tire would cost approximately $15 to "plug."

31.    On or about November 14, 2007, the Total Loss Light on Plaintiff's vehicle indicated that a Tire had lost all or substantially all air pressure. Plaintiff brought the Vehicle to BMW of Manhattan, which determined that the Tire had sufficient air pressure.

32.    On June 23, 2008, the Total Loss Light on Plaintiff's vehicle once again indicated that one tire on Plaintiff's vehicle had lost all or substantially all air pressure. Plaintiff brought the vehicle to BMW of Manhattan, which determined that Plaintiff's right rear tire—which had

7

been replaced on August 17, 2007—was once again flat. According to BMW of Manhattan, the tire had a "blown out bubble." Plaintiff paid $389.19 for a new Tire.

33.    On August 25, 2008, the Total Loss Light on Plaintiff's vehicle indicated that one tire had a terminal loss of air pressure. Plaintiff brought the vehicle to BMW of Manhattan, which determined that the Tire had sufficient air pressure.

34.    As a result of the frequent problems Plaintiff has had with the Tires, Plaintiff does not feel comfortable driving the Vehicle he leased for fear that a Tire will fail, or that the TPMS will falsely alert that a Tire has failed. Thus, Plaintiff considers the Vehicle to be unfit for driving and highly unreliable due to the placement of the Tires on the Vehicle.

**Defendants Knew the Tires Were Defective**

35.    The fact that the Tires were defective was no secret to Defendants. On information and belief, Defendants received hundreds, if not thousands, of complaints regarding the Tires. BMW dealers are aware that the Tires are defective and have either communicated this information to BMW or been made aware of the defects in the Tires by BMW. BMW dealers have received numerous complaints from dissatisfied owners and lessees of Vehicles with Bridgestone run-flat Tires.

36.    BMW, according to *BusinessWeek*, has been an "aggressive" proponent of run-flat tires. On some BMW models—including the entire BMW 3 series, as well as the BMW X5 sport utility vehicle and all vehicles in the BMW 1 Series—run-flat tires come standard on the vehicle and no other option is available.

37.    BMW specifically engineered the suspensions in its automobiles to be used with run-flat tires, which, due to their stiff sidewalls, have different handling attributes from radial tires. Such changes require extensive testing of both the vehicle and the tires for which the

8

vehicle is being designed. This testing did, or should have, uncovered the fact that the Tires are defective.

38.    Bridgestone, as the manufacturer of the Tires, performed extensive testing on all aspects of the Tires. In a November 10, 2006 press release, regarding the Tires, Bridgestone stated: "prototype tires produced in the Wilson [, North Carolina] plant were rigorously evaluated in the United States, Japan, Germany and France to ensure that they met the stringent BMW tire performance requirements. . . . In order to qualify as a supplier of these American-made tires to BMW, the Wilson facility had to undergo a thorough evaluation and audit process conducted by the BMW AG Purchasing and BMW MC Supplier Quality Assurance groups." This testing did, or should have, uncovered the fact that the Tires are defective.

39.    Internet message boards are filled with complaints regarding the Tires. Defendants either know of the postings on these message boards or have willfully remained ignorant to them. Following are complaints selected from among the hundreds of postings that can be found on the Internet regarding the Vehicles and the Tires:

- Last [night], I got my third flat tire in two years—with a run flat tire....It appears BMW is content with offering their long-time customers a bad product. January 12, 2008 at http://blogs.consumerreports.org/cars/2007/06/run-flat-tires-.html.

- I too leased a 2006 BMW 330i. While negotiating my lease, I asked many questions about the run-flat tires as I did not have to have an issue replacing tires, as one of my friends did with their Mercedes. I was assured replacing the tires was not a problem. Boy, do I feel like a sucker. I had to replace one tire in November 2007. What a hassle. I live in the San Francisco Bay area and it took [me] many hours just to find someone with a tire that would match. The cost to me, was $403, for one tire. Now, I am faced with replacing another tire. I don't even know which one yet. The light and bell just went off of my car yesterday. I will never purchase a car with run flat tires again. What a hassle and expense. I've been driving for 30 years and have never had a flat tire until now. February 16, 2008 at http://blogs.consumerreports.org/cars/2007/06/run-flat-tires-.html.

- I just replaced my fifth run flat tire on my 2006 BMW 3 series in seven months. When I purchased the car in 2006--my second BMW--the salesperson did [not]

9

come close to mentioning how susceptible these tires are to punctures; nor did they mention the short life span of the tires or the fact that I'd spend $300 each time the tire had to be changed. I often touted the virtues of owning the BMW when I discussed cars with friends. But no more. BMW's continued promotion of this shoddy product has all but ensured I will never purchase another one. June 9, 2008 at http://blogs.consumerreports.org/cars/2007/06/run-flat-tires-.html.

- I have a 2007 BMW 335i that came with bridgestone run flat tires. At first I thought it was a great idea to have the run flat tires because I do a lot of driving at night, so I thought I'll be safer with the run flat because I could still drive 90miles (not true). It's the worse decision BMW made, these tires suck. I got bubbles on both of my front tires, when my car was only a few months old. Took it to the dealer and they told me it was do to pot holes....I just think that for high performance cars we need high performance tires that are not going to risk your life if they burst when you accidentally hit a bump or pot hole. I think is ridiculous to pay $390 for a single tire that if you hit ONE pot hole, you need to buy new tires. September 30, 2008 at http://blogs.consumerreports.org/cars/2007/06/run-flat-tires-.html.

- Worst tires ever on my 2008 [BMW] X5. Had to replace 2 tires, less than 10,000 miles due to bubbles on the sides of the tires. Bridgestone Duelers. Neither BMW or Bridgestone could care less. This could be my last BMW (have driven BMW's over 20 years) due to these run flat tires as original equipment. http://www.bmwrunflattire.com/

- 2006 330xi. Four flats in a year and a half. The tires are terrible and I wish someone at BMW would acknowledge that fact and fix the problem. http://www.bmwrunflattire.com/

- As a 325I owner, I just want somebody to tell us how to get rid of the RFT's and sensors. Can we still use the rims with conventional tires? I know someone out there works for BMW and knows what we can do to get rid of these problems. http://www.bmwrunflattire.com/

- I have a 2007 335i I leased in March 2007. Within 1 month, my front tire formed a bubble, even though I did not recall hitting a pothole. I replaced that tire at BMW - $450. Now, over one year later, all 4 tires have bubbles. Any suggestions? http://www.bmwrunflattire.com/

- My mom has had her 328i for 8 months and already has her second flat ($368.00) tire with only 3,000 miles on the vehicle. She will now be putting four regular tires on her vehicle and never buying a BMW again!!! http://www.bmwrunflattire.com/

**Defendants Failed to Disclose the Defects**

40.    Defendants failed to disclose the following material facts to Plaintiff.  Had Plaintiff known these facts, Plaintiff would not have agreed to lease the vehicle:

- Plaintiff's vehicle was equipped with the Tires;

- The Tires were not fit for use on normal streets;

- The Tires were highly susceptible to flats, punctures and bubbles, and would fail at a significantly higher rate than radial tires;

- The Tires could not be repaired, only replaced, in the event of a small puncture;

- The Tires are exorbitantly priced, costing approximately $400 per tire;

- A car with the Tires cannot be reconfigured to accommodate radial tires;

- Many service stations do not sell the Tires.  Thus, Plaintiff would be required to take his BMW to a dealership, which could be dozens, or hundreds, of miles away;

- The TPMS would create multiple false alarms, causing Plaintiff to spend an inordinate amount of time taking the Vehicle to the dealer.

**Defendants Were Unresponsive to Plaintiff's Complaints**

41.    Plaintiff contacted BMW to notify BMW of the defects in the Vehicle and to give BMW an opportunity to remedy the defect.  BMW refused to offer Plaintiff a remedy or cure the defect.

42.    Plaintiff contacted Bridgestone to notify Bridgestone of the defects in the Tires and to give Bridgestone an opportunity to remedy the defect.  Bridgestone refused to offer Plaintiff a remedy or cure the defect.  Further, Bridgestone informed Plaintiff that Bridgestone

11

did not care to even keep a record of the conversation or take Plaintiff's name, explaining that this information would be put in a file and Bridgestone would do nothing.

43.    Plaintiff also contacted the dealership from which he leased his BMW several times, similarly to no avail. The dealership offered to Plaintiff, and has begun offering to the public via its website for approximately $70, the service of adding nitrogen filler as a stabilization agent to the Tires—which would void Bridgestone's limited warranty covering the Tires.

## CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of himself and the following Class and Sub-Class:

**Nationwide Class:**

All current and former owners and lessees of 2006, 2007, 2008 and 2009 BMW vehicles equipped with run-flat tires manufactured by Bridgestone and sold or leased in the United States ("Nationwide Class") whose Tires have gone flat and been replaced.

**New Jersey Sub-Class**

All current and former owners and lessees of 2006, 2007, 2008 and 2009 BMW vehicles equipped with run-flat tires manufactured by Bridgestone and sold or leased in the State of New Jersey ("Sub-Class") whose Tires have gone flat and been replaced.

45.    Excluded from the Class and the Sub-Class are Defendants, as well as Defendants' affiliates, employees, officers and directors, including franchised dealers, and any person who has experienced physical injury as a result of the defects at issue in this litigation. Plaintiffs reserve the right to amend the definition of the Class and the Sub-Class, if discovery and/or further investigation reveals that the Class and/or Sub-Class should be expanded or otherwise modified.

12

46.     Numerosity/Impracticability of Joinder:  The members of the Class and Subclass are so numerous that joinder of all members would be impracticable.  The members of the Class and the Sub-Class are readily identifiable from information and records in Defendants' possession, custody or control.

47.     Plaintiff reasonably estimates that there are thousands of Class members who purchased or leased Vehicles equipped with the Tires, and at least hundreds, if not thousands, of members of the Sub-Class who purchased or leased Vehicles equipped with the Tires in New Jersey.  As of 2005, Defendant Bridgestone had shipped over three million run-flat tires.  On information and belief, the market for run-flat tires has expanded significantly since 2005, and millions of additional run-flat tires, including the Tires at issue in this case, have been shipped by Bridgestone.

48.     Commonality and Predominance:     Common questions of law and fact predominate over any questions affecting only individual members of the Class and the Sub-Class.  These common legal and factual questions, which do not vary from one Class or Sub-Class member to another, and which may be determined without reference to the individual circumstances of any Class or Sub-Class member, include, but are not limited, to the following:

        a.      Whether Defendants omitted and/or concealed material facts from Plaintiffs and the Class regarding the defective Tires;

        b.      Whether, by the misconduct set forth in this Complaint, BMW has engaged in unfair or unlawful business practices with respect to the sale or leasing of the Vehicles;

        c.      Whether Defendants had a duty to disclose the defect to Plaintiff and the Class and Sub-Class;

d.      Whether, by its conduct, BMW violated the New Jersey Consumer Fraud Act and/or other consumer protection statutes;

e.      Whether, by their conduct described herein, Defendants breached their implied warranties with Plaintiffs and the Class and Sub-Class;

f.      Whether, by its conduct described herein, BMW breached its duty of good faith and fair dealing;

g.      Whether the Tires are defective;

h.      Whether the TPMS is defective;

i.      Whether, as a result of Defendants' misconduct, Plaintiff and the Class and Sub-Class are entitled to damages; and;

j.      Whether, as a result of Defendants' misconduct, Plaintiff and the Class and Sub-Class are entitled to equitable relief and/or other relief, and, if so, the nature of such relief.

49.    Typicality: Plaintiff's claims are typical of the claims of the Class and Sub-Class, because Plaintiff and all Class members were injured by the same wrongful practices in which Defendants engaged. Plaintiff's claims arise from the same practice and course of conduct that gives rise to the claims of Class and Sub-Class members, and are based on the same or similar legal theories. The only difference could be the amount of damages sustained, which can be determined readily, and does not bar class certification.

51.    Adequacy: Plaintiff will fully and adequately protect the interests of the members of the Class and the Sub-Class, and has retained class counsel who are experienced and qualified in prosecuting class actions, including consumer class actions and other forms of complex litigation. Neither Plaintiff nor his counsel has interests which are contrary to or

conflicting with those of the Class or the Sub-Class. Defendants have no defenses unique to Plaintiff.

52.    Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons:

a.    It is economically impractical for members of the Class and Sub-Class to prosecute individual actions;

b.    The Class and Sub-Class are readily definable;

c.    Prosecution as a class action will eliminate the possibility of repetitious litigation; and

d.    A class action will enable claims to be handled in an orderly and expeditious manner. A class action will save time and expense and will ensure uniformity of decisions.

53.    Plaintiff does not anticipate any difficulty in the management of this litigation.

54.    Defendants have, or have access to, address information for the Class members, which may be used for the purpose of providing notice of the pendency of this action.

### Notice to New Jersey Attorney General

55.    A copy of this Complaint will be mailed to the Attorney General of the State of New Jersey as required by N.J.S.A. § 56:8-20.

### COUNT I

### Asserted On Behalf Of The Nationwide Class Against BMW
### (Violations Of Magnuson-Moss Act (15 U.S.C. §§ 2301-2312) - Implied Warranty)

56.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

57.    The Vehicles are "consumer products" as that term is defined by 15 U.S.C. §

15

2301(1).

58.     Plaintiff and Nationwide Class members are "consumers" as that term is defined by 15 U.S.C. § 2301(3).

59.     BMW is a "supplier" as that term is defined by 15 U.S.C. § 2301(4).

60.     BMW is a "warrantor" as that term is defined by 15 U.S.C. § 2301(5).

61.     BMW provided Plaintiff and Class members with "implied warranties" as that term is defined by 15 U.S.C. § 2301(7).  When the Vehicles were sold or leased to Plaintiff and the Nationwide Class, implied warranties under state law attached, specifically the implied warranty of merchantability.

62.     The vehicles were not fit for their ordinary purpose due to the placement of the defective Tires and the defective TPMS.

63.     Any attempt by BMW to disclaim the implied warranty of merchantability with respect to the Tires is void due to BMW's knowledge or failure to know that the Tires were defective when sold to Plaintiff and the Nationwide Class

64.     BMW cannot disclaim the implied warranty of merchantability that attaches to the Vehicles, including the Tires, because BMW provided Plaintiff and the Nationwide Class with "written warranties" as that term is defined by 15 U.S.C. § 2301(6).  BMW's website states that it makes "well-equipped models" with "exhilarating performance" and "unrivaled value to the competition."  On its website, BMW states that "Speed and power are just the beginning.  Your BMW is designed to make high performance a part of your everyday drive, for years to come."  BMW's attempt to disclaim the implied warranty of merchantability with respect to the Tires is therefore a violation of 15 U.S.C. § 2308.

16

65.    Plaintiff has given BMW a reasonable opportunity to cure its failures with respect to its warranties, and BMW failed to do so.

66.    Plaintiff and the Nationwide Class were damaged by BMW's breach of its warranties.

67.    As a result of BMW's breach of implied warranties, Plaintiff and Nationwide Class members are entitled to revoke their acceptance of the Vehicles, obtain damages and equitable relief, and obtain attorneys' fees and costs pursuant to 15 U.S.C. § 2310.

## COUNT II

### Asserted On Behalf Of The Nationwide Class Against Bridgestone
### (Violations Of Magnuson-Moss Act (15 U.S.C. §§ 2301-2312) - Implied Warranty)

68.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

69.    The Tires are "consumer products" as that term is defined by 15 U.S.C. § 2301(1).

70.    Plaintiff and Nationwide Class members are "consumers" as that term is defined by 15 U.S.C. § 2301(3).

71.    Bridgestone is a "supplier" as that term is defined by 15 U.S.C. § 2301(4).

72.    Bridgestone is a "warrantor" as that term is defined by 15 U.S.C. § 2301(5).

73.    Bridgestone provided Plaintiff and Class members with "implied warranties" as that term is defined by 15 U.S.C. § 2301(7).  When the Vehicles and/or tires were sold or leased to Plaintiff and the Nationwide Class, implied warranties under state law attached, specifically the implied warranty of merchantability.

74.    The Tires were not fit for their ordinary purpose because they pop or bubble under normal driving conditions and cannot be repaired in the event of a small puncture.

75.    Any attempt by Bridgestone to disclaim the implied warranty of merchantability with respect to the Tires is void due to Bridgestone's knowledge or failure to know that the Tires were defective when sold to Plaintiff and the Nationwide Class.    Bridgestone cannot disclaim the implied warranty of merchantability that attaches to the Tires, because Bridgestone provided Plaintiff and the Nationwide Class with "written warranties" as that term is defined by 15 U.S.C. § 2301(6).

76.    Plaintiff has given Bridgestone a reasonable opportunity to cure its failures with respect to its warranties, and Bridgestone failed to do so.

77.    As a result of Bridgestone's breach of implied warranties, Plaintiff and Nationwide Class members are entitled to revoke their acceptance of the Vehicles and/or the Tires, obtain damages and equitable relief, and obtain attorneys' fees and costs pursuant to 15 U.S.C. § 2310.

## COUNT III

### Asserted On Behalf Of The Sub-Class Against BMW
### (Violations Of New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-1 et seq.))

78.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

79.    Plaintiff, other members of the Sub-Class, and BMW are "persons" within the meaning of the New Jersey Consumer Fraud Act (the "CFA").

80.    Plaintiff and other members of the Classes are "consumers" within the meaning of the CFA.

81.    The Vehicles and Tires are "merchandise" within the meaning of the CFA.

82.    At all relevant times material hereto, BMW conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

83.     The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

84.     The practices of BMW violate the CFA for, *inter alia,* one or more of the following reasons:

        a.     BMW concealed from Plaintiff and the Sub-Class the material fact that the Tires were defective, would pop or sustain bubbles from use under normal driving conditions;

        b.     BMW concealed from Plaintiff and the Sub-Class the material fact that the Tires could not be repaired in the event of event a small puncture;

        c.     BMW concealed from Plaintiff and the Sub-Class the material fact that the Tires are extremely expensive;

        d.     BMW concealed from Plaintiff and the Sub-Class the material fact that a car with run-flat tires cannot be reconfigured to operate with non run-flat tires;

        e.     BMW concealed from Plaintiff and the Sub-Class the material fact that the TPMS were defective and would cause false alarms, which, combined with the inability to visually detect a flat tire would require unnecessary expenditures of time in obtaining service; and

        e.     BMW engaged in unconscionable commercial practices in failing to offer a remedy to Plaintiff and the Sub-Class.

85.     BMW consciously omitted to disclose material facts from Plaintiffs and other members of the Class with respect to the placement and use of Tires on the Vehicles.

86.     BMW's unconscionable conduct described herein included the omission and concealment of material facts concerning the Tires and their placement and use on the Vehicles.

87.     BMW intended that Plaintiff and the Sub-Class rely on BMW's acts of concealment and omissions, so that Plaintiff and other Sub-Class members would purchase and/or lease Vehicles equipped with the Tires.

88.    Had BMW disclosed all material information regarding the Tires and their placement and use on the Vehicles to Plaintiff and the Sub-Class, they would not have purchased and/or leased the Vehicles equipped with the Tires, or would have paid less for the Vehicles.

89.    The foregoing acts, omissions and practices proximately caused Plaintiff and other members of the Classes to suffer an ascertainable loss in the form of, *inter alia,* monies spent to replace the Tires and/or in diminution in value, and they are entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees and costs of suit.

## COUNT IV

### Asserted On Behalf Of The Class Against Bridgestone
### (Violations Of New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-1 et sea.))

90.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

91.    Plaintiff, other members of the Sub-Class, and Bridgestone are "persons" within the meaning of the CFA.

92.    Plaintiff and other members of the Classes are "consumers" within the meaning of the CFA.

93.    The Tires are "merchandise" within the meaning of the CFA.

94.    At all relevant times material hereto, Bridgestone conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

95.    The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

96.    The practices of Bridgestone violate the CFA for, *inter alia,* one or more of the following reasons:

a. Bridgestone concealed from Plaintiff and the Sub-Class the material fact that the Tires were defective, would pop or sustain bubbles from use under normal driving conditions;

b. Bridgestone concealed from Plaintiff and the Sub-Class the material fact that the Tires could not be repaired in the event of even a small puncture;

c. Bridgestone concealed from Plaintiff and the Sub-Class the material fact that the Tires are extremely expensive;

d. Bridgestone engaged in unconscionable commercial practices in failing to offer a remedy to Plaintiff and the Sub-Class.

97. Bridgestone consciously omitted to disclose material facts from Plaintiff and other members of the Sub-Class with respect to the placement and use of Tires on the Vehicles.

98. Bridgestone's unconscionable conduct described herein included the omission and concealment of material facts concerning the Tires and their placement and use on the Vehicles.

99. Bridgestone intended that Plaintiff and the Sub-Class rely on Bridgestone's acts of concealment and omissions, so that Plaintiff and other Sub-Class members would purchase and/or lease Vehicles equipped with the Tires.

100. Had Bridgestone disclosed all material information regarding the Tires and their placement and use on the Vehicles to Plaintiff and the Sub-Class, they would not have purchased and/or leased the Vehicles equipped with the Tires, or would have paid less for the Vehicles and/or Tires.

101. The foregoing acts, omissions and practices proximately caused Plaintiff and other members of the Classes to suffer an ascertainable loss in the form of, *inter alia,* monies spent to replace the Tires and/or in diminution in value, and they are entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees and costs of suit.

## COUNT V

### Asserted On Behalf Of The Sub-Class Against BMW
### (Breach Of Express Warranty)

102.   Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

103.   BMW's website states that it makes "well-equipped models" with "exhilarating performance" and "unrivaled value to the competition." On its website, BMW states that "Speed and power are just the beginning. Your BMW is designed to make high performance a part of your everyday drive, for years to come." The placement of the Tires and TPMS on the Vehicles, as explained herein, is a breach of this warranty.

104.   As a direct and proximate cause of BMW's breach of express warranties, Plaintiff and the Nationwide Class members have been damaged.

105.   Plaintiff has given BMW a reasonable opportunity to cure its failure with respect to its warranty, and BMW has failed to do so.

106.   As a result of BMW's breach of express warranty, Plaintiffs and Class members have suffered damages.

## COUNT VI

### Asserted On Behalf Of The Sub-Class Against BMW
### (Breach Of Implied Warranty Of Merchantability)

107.   Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

108.   BMW is a "merchant" within the meaning of N.J. Stat. § 12A:2-314.

109.   The Vehicles are "goods" within the meaning of N.J. Stat. § 12A:2-314.

110.    BMW's implied warranty of merchantability accompanied the sale of the Vehicles and the Tires placed on the Vehicles to Plaintiff and members of the Sub-Class.

111.    BMW, by implication, warranted that the Vehicles, TPMS and/or the Tires were fit for ordinary use.

112.    The frequent failure of the Tires made the Vehicles and Tires defective and, thus, unfit for the ordinary purposes for which the goods are used.  The Tires are not fit for ordinary use because they pop or bubble under normal driving conditions.  The Vehicles are unfit for ordinary use because they cannot be refitted with non run-flat tires.  Many BMWs, including the 3 Series vehicles like Plaintiff has leased, were engineered specifically for use with run-flat tires.  The placement of the Tires on the Vehicles renders the Vehicles unfit for driving.

113.    As set forth herein, any effort by BMW to disclaim or otherwise limit its responsibility for the defective Vehicles, TPMS and/or Tires was unconscionable under all of the circumstances.  BMW knew that the tires were unfit for normal use when the Tires were placed on the Vehicles.  BMW's attempt to disclaim any warranty on the Vehicles, TPMS and/or Tires is therefore unjust and cannot stand.

114.    Through the conduct described herein, BMW has breached its implied warranty of merchantability and is liable to Plaintiff and the Sub-Class.

115.    Plaintiff and the other members of the Sub-Class have sustained damages as a result of BMW's breaches.

116.    Plaintiff has provided timely notice to BMW regarding the problems he was experiencing with the Vehicles and Tires and, notwithstanding such notice, BMW has failed and refused to offer Plaintiff a remedy.

## COUNT VII

### Asserted On Behalf Of The Sub-Class Against Bridgestone
### (Breach Of Implied Warranty Of Merchantability)

117.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

118.    Bridgestone is a "merchant" within the meaning of N.J. Stat. § 12A:2-314.

119.    The Tires are "goods" within the meaning of N.J. Stat. § 12A:2-314.

120.    Bridgestone's implied warranty of merchantability accompanied the sale or lease of the Tires placed on the Vehicles to Plaintiff and members of the Sub-Class.

121.    Bridgestone, by implication, warranted that the Tires were fit for ordinary use.

122.    The frequent failure of the Tires made the Tires defective and, thus, unfit for the ordinary purposes for which the Tires are used.  For example, Plaintiff drove his Vehicle for just over *one month* before the first Tire failure.  The Tires are not fit for normal use because they pop or bubble under normal conditions, are overly susceptible to punctures, and cannot be repaired in the event of a small puncture.

123.    As set forth herein, any effort by Bridgestone to disclaim or otherwise limit its responsibility for the defective Tires was unconscionable under all of the circumstances. Bridgestone knew that the tires were unfit for normal use when the Tires were placed on the Vehicles.  Bridgestone's attempt to disclaim any warranty on the Tires is therefore unjust and cannot stand.

124.    Through the conduct described herein, Bridgestone has breached its implied warranty of merchantability and is liable to Plaintiff and members of the Sub-Class.

125.    Plaintiff and the other members of the Sub-Class have sustained damages as a result of Bridgestone's breaches.

126.    Plaintiff has provided timely notice to Bridgestone regarding the problems he was experiencing with the Tires and, notwithstanding such notice, Bridgestone has failed and refused to offer Plaintiff a remedy.

## COUNT VIII

### Asserted on Behalf of the Sub-Class Against BMW
### (Breach of Contract)

127.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

128.    Plaintiff and Sub-Class members entered into agreements to purchase or lease Vehicles equipped with the Tires with BMW, or otherwise were in contractual privity with BMW as a result of the express warranty described herein, as well as the specifications included with the purchase or lease of the Vehicles.

129.    Plaintiff and the Sub-Class members performed all of their obligations under the contracts. BMW breached its obligations under the contracts as alleged herein.

130.    Moreover, regardless of whether Plaintiff and the Classes were in contractual privity with BMW, BMW still may be held to have breached its contracts with Plaintiff and the Sub-Class. As alleged herein, BMW committed acts and omissions which were actuated by malice and/or accompanied by a wanton and willful disregard of persons, including Plaintiff and the members of the Classes, who foreseeably might be harmed by those acts and omissions.

131.    BMW failed to disclose the true nature of the Tires, and the fact that the Tires would render the Vehicles unfit for use. BMW knew or recklessly disregarded the fact that Plaintiff and the Sub-Class were not knowledgeable with regard to the frequent failures, cost, and

25

true nature of the Tires as alleged herein, yet did not disclose that information to Plaintiff and the Sub-Class.

132.    As a direct and proximate result of BMW's breach of contract, Plaintiff and Sub-Class members have been damaged.

## COUNT IX

### Asserted On Behalf Of The Sub-Class Against BMW
### (Breach Of Implied Covenant Of Good Faith And Fair Dealing)

133.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

134.    Plaintiff and Sub-Class members entered into agreements to purchase or lease Vehicles equipped with Tires with BMW, or otherwise were in contractual privity with BMW as a result of the express warranty described herein, as well as the specifications included with the purchase or lease of the Vehicles.

135.    The contracts and warranties were subject to the implied covenant that BMW would conduct business with Plaintiff and Sub-Class members in good faith and would deal fairly with Plaintiff and Sub-Class members.

136.    Moreover, regardless of whether Plaintiff and the Sub-Class were in contractual privity with BMW, BMW still had a duty of good faith and fair dealing. As alleged herein, BMW committed acts and omissions which were actuated by malice and/or accompanied by a wanton and willful disregard of persons, including Plaintiff and the members of the Classes, who foreseeably might be harmed by those acts and omissions.

137.    BMW breached those implied covenants by selling or leasing to Plaintiff and members of the Sub-Class Vehicles that were not fit for ordinary use, and that were equipped with Tires that were inherently defective when BMW knew, or should have known, that the Tires

were defective. BMW failed to disclose the true nature of the Tires, and the fact that the Tires would render the Vehicles unfit for use. BMW knew or recklessly disregarded the fact that Plaintiff and the Sub-Class were not knowledgeable with regard to the frequent failures, cost, and true nature of the Tires as alleged herein, yet did not disclose that information to Plaintiff and the Sub-Class. BMW also breached those covenants by refusing to provide Plaintiff and the Sub-Class with a remedy.

138.    BMW behaved inequitably. BMW was totally unresponsive to Plaintiff's complaints, acted in total disregard of the harm caused to Plaintiff and the Sub-Class, and unjustly enriched itself at the expense of Plaintiff and the Sub-Class.

139.    As a direct and proximate result of BMW's breach of its implied covenants, Plaintiffs and Class members have been damaged.

## COUNT X

### Asserted on Behalf of the Sub-Class Against Bridgestone
### (Breach of Contract)

140.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

141.    Plaintiff and Sub-Class members entered into agreements to purchase or lease Vehicles equipped with the Tires with BMW, or otherwise were in contractual privity with BMW as a result of the express warranty described herein, as well as the specifications included with the purchase or lease of the Vehicles. The Tires, which were manufactured by Bridgestone, were part of the Vehicles. Plaintiff and the Sub-Class members performed all of their obligations under the contracts. Bridgestone breached its obligations under the contracts as alleged herein.

142.    Moreover, regardless of whether Plaintiff and the Classes were in contractual privity with Bridgestone, Bridgestone committed acts and omissions which were actuated by

27

actual malice and accompanied by a wanton and willful disregard of persons, including Plaintiff and Sub-Class members, who foreseeably might be harmed by those acts and omissions.

143.    Bridgestone failed to disclose the true nature of the Tires, and the fact that the Tires would render the Vehicles unfit for use. Bridgestone knew or recklessly disregarded the fact that Plaintiff and the Sub-Class were not knowledgeable with regard to the frequent failures, cost, and true nature of the Tires as alleged herein, yet did not disclose that information to Plaintiff and the Sub-Class.

144.    As a direct and proximate result of BMW's breach of contract, Plaintiff and Sub-Class members have been damaged.

## COUNT XI

### Asserted On Behalf Of The Sub-Class Against Bridgestone
### (Breach Of Implied Covenant Of Good Faith And Fair Dealing)

145.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

146.    Plaintiff and Sub-Class members entered into agreements to purchase or lease Vehicles equipped with the Tires. Although Bridgestone was not a party to these contracts, Bridgestone had a duty to act in good faith because the Tires were placed on the Vehicles.

147.    The contracts and warranties were subject to the implied covenant that BMW would conduct business with Plaintiff and Sub-Class members in good faith and would deal fairly with Plaintiff and Sub-Class members.

148.    Bridgestone breached those implied covenants by allowing the Tires to be placed on the Vehicles, with knowledge that the Tires were unfit for normal use. Bridgestone failed to disclose the true nature of the Tires, and the fact that the Tires would render the Vehicles unfit for use. Bridgestone knew or recklessly disregarded the fact that Plaintiff and the Sub-Class

28

were not knowledgeable with regard to the frequent failures, cost, and true nature of the Tires as alleged herein, yet did not disclose that information to Plaintiff and the Sub-Class. Bridgestone also breached those covenants by refusing to provide Plaintiff and the Sub-Class with a remedy.

149.    Moreover, regardless of whether Plaintiff and the Sub-Class were in contractual privity with Bridgestone, Bridgestone still had a duty of good faith and fair dealing.

150.    Bridgestone committed acts and omissions which were actuated by actual malice and accompanied by a wanton and willful disregard of persons, including Plaintiff and Sub-Class members, who foreseeably might be harmed by those acts and omissions.

151.    Bridgestone behaved inequitably.    Bridgestone was totally unresponsive to Plaintiff's complaints, acted in total disregard of the harm caused to Plaintiff and the Sub-Class, and unjustly enriched itself at the expense of Plaintiff and the Sub-Class.

152.    As a direct and proximate result of Bridgestone's breach of its implied covenants, Plaintiffs and Sub-Class members have been damaged.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of himself and on behalf of the Classes prays:

A.    For an order certifying this action as a class action, appointing Plaintiff as representative of the Classes and appointing his attorneys as counsel for the Classes;

B.    For all compensatory damages on all applicable claims in an amount to be proven at trial;

C.    For treble damages under the New Jersey Consumer Fraud Act;

D.    For an order permanently enjoining Defendants from engaging in the unlawful practices alleged herein;

E.    For an award of attorneys' fees, costs and expenses; and

29

F.    For such other and further relief that the Court deems appropriate and just under the circumstances.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury.

Dated: November 21, 2008

MCLAUGHLIN & STERN, LLP

By: _____
Alan E. Sash (AS 8804)
Steven J. Hyman
260 Madison Avenue
New York, New York 10016
Tel: 212-448-1100
Fax: 212-448-0066

Karin E. Fisch
Orin Kurtz
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016
Tel: 212-889-3700
Fax: 212-684-5191

Attorneys for Plaintiff