**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| JEFFREY MARCUS, Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiff,<br>v.<br><br>BMW OF NORTH AMERICA, LLC, BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC AND BRIDGESTONE CORPORATION<br><br>Defendants. | Civil Action No. 08-5859 (KSH)<br><br>**OPINION** |

**KATHARINE S. HAYDEN, U.S.D.J.**

**I. Introduction**

  To say that Jeffrey Marcus ("Marcus") is dissatisfied with the Bridgestone run-flat tires on his BMW is an understatement.  In the within lawsuit, he claims that the tires are defective in that they are stiff and abnormally susceptible to road hazard damage, and he claims that BMW and the Bridgestone defendants knew about this defect but failed to tell him.  (Oral Argument Tr. 10:7–18.)  He also claims that BMW and the Bridgestone defendants failed to tell him about other important information regarding the tires: that they are more expensive than conventional tires, that they are difficult—if not impossible—to repair, and that BMW vehicles are specially designed to accommodate the unique characteristics of run-flat tires, so that he can only use run-flats on his vehicle for as long as he owns it and can never put conventional tires on it.  (*Id.* at

1

10:23–11:4; Kurtz Ex. 23, at 4.)  He claims that hundreds, and perhaps thousands, of other BMW purchasers nationwide were victims of the defendants' failure to disclose material information.

On this basis, Marcus sued BMW of North America ("BMW") and Bridgestone Firestone North American Tire, LLC (now known as Bridgestone Americas Tire Operations, LLC, or "BATO") on behalf of himself and a putative class.  (D.E. 1)  In an amended complaint filed on February 27, 2009, Marcus asserted claims under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301–2312 ("MMWA"), on behalf of a nationwide class consisting of "[a]ll current and former owners and lessees of 2006, 2007, 2008, and 2009 BMW vehicles equipped with run-flat tires manufactured by Bridgestone and/or BATO and sold or leased in the United States . . . whose Tires have gone flat and been replaced."  (D.E. 26; Pl.'s Class Certif. Br. 3.)  In addition, on behalf of a putative sub-class defined in terms identical to the nationwide class, but limited to those who bought or leased their cars in New Jersey, Marcus asserted the following claims: (1) violations of the New Jersey Consumer Fraud Act ("NJCFA"), (2) breach of express warranty, (3) breach of the implied warranty of merchantability, (4) breach of contract, (5) and breach of the implied covenant of good faith and fair dealing.  (Amended Compl. ¶¶ 61–159.)  Marcus added the Bridgestone Corporation ("Bridgestone") to the complaint on April 20, 2009.  (D.E. 40.)  BATO and Bridgestone will be referred to collectively as "the Bridgestone defendants."

Having survived the defendants' motions to dismiss (D.E. 118), Marcus now moves for certification of his proposed classes.  (D.E. 144.)  He also moves to exclude the expert report of William D. Pettit ("Pettit"), retained by BMW to opine on BMW's marketing efforts and consumer experience.  (D.E. 198.)  The defendants, meanwhile, move to exclude the expert report and testimony of Marcus's expert Charles G. Gold ("Gold"), retained to opine on the common characteristics of various Bridgestone run-flat tire models.  (D.E. 207.)

**II. The Requirements for Class Certification**

To certify a class under Rule 23, the party seeking certification must establish four prerequisites under Rule 23(a) and then establish that the action is one of three types listed under Rule 23(b) that may be certified. Fed. R. Civ. P. 23(a)–(b); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 n.6 (3d Cir. 2008). Under Rule 23(a), a court may certify a class if

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed R. Civ. P. 23(a). Under Rule 23(b)(3), which Marcus invokes here, a class action may be maintained if the court finds that questions of law or fact common to the class members predominate over individual questions, and a class action is the superior method of fairly and efficiently resolving the controversy. Fed. R. Civ. P. 23(b)(3). The party seeking certification bears the burden of establishing each of the Rule 23 requirements. *Hydrogen Peroxide*, 552 F. 3d at 316 & n.14.

A court considering a motion for class certification must conduct a rigorous analysis. *Id.* at 316. It must make all necessary factual and legal inquiries and resolve any genuine legal or factual disputes, "even if they overlap with the merits." *Id.* at 306. However, the plaintiff need not prove the elements of its claim. *Id.* at 311. Indeed, "[t]he ability of a named plaintiff to succeed on his or her individual claims has never been a prerequisite to certification of the class." *Hassine v. Jeffes*, 846 F.2d 169 (3d Cir. 1988) (holding that the mere fact that representative plaintiffs could not establish Eighth Amendment violations as to their own treatment did not preclude court from examining prison conditions with regard to the entire class of inmates); *see also Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir. 1982) ("If the . . . . defendants were arguing that a district court must determine whether the named plaintiffs have

3

a meritorious claim before they can be certified as class representatives, they would plainly be wrong.").

**A. Rule 23(a)**

**i. Numerosity**

In satisfying the burden of establishing that the class is so numerous as to make joinder impossible, the plaintiff need only demonstrate that common sense suggests that joinder of all class members would be difficult or inconvenient. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 510 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998). While a mere allegation or speculation will not suffice, *Berry v. Baca*, 226 F.R.D. 398, 403 (C.D. Cal. 2005), "it is not necessary to demonstrate the precise number of class members when a reasonable estimate can be inferred from facts in the record." *Szczubelek v. Cendant Mortg. Corp.*, 215 F.R.D. 107, 116 (D.N.J. 2003). "A court may even certify a class whose size is unknown, if common sense or common knowledge indicates that it will be large." *Lloyd v. City of Philadelphia*, 121 F.R.D. 246, 249 (E.D. Pa. 1988). In addition, while Third Circuit courts have typically found numerosity to be established when a class consists of 40 or more members, *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001), the number of class members is not determinative, and a court's numerosity analysis should take into account other factors, such as "ease of identifying members and determining addresses, ease of service on members if joined, geographical dispersion and whether proposed members of the class would be able to pursue remedies on an individual basis." *Liberty Lincoln Mercury*, 149 F.R.D. at 74.

In support of numerosity, Marcus states that BMW sold or leased more than 900,000 vehicles in model years 2006–2009, and that the vast majority of those vehicles came with run-flat tires. (Pl.'s Class Certif. Br. 16.) Of the nearly 600 "customer contacts" BMW received

regarding run-flat tires, 196 specifically refer to Bridgestone's run-flat tires. (BMW Class Certif. Br. 14.) Finally, according to Marcus, BMW dealers have received thousands of complaints from customers about their tires, and thousands of BMW purchasers have submitted claims under various road hazard warranty programs, including BMW's own program. (Pl's Class Certif. Br. 16–17.)

The defendants, meanwhile, contend that Marcus has failed to show how many of the complaining customers experienced a flat Bridgestone tire, that Marcus has failed to show a relationship between the road hazard warranty claims and flat Bridgestone tires, and that Marcus has failed to show what brands or problems BMW customers have complained to their dealers about. (BMW Class Certif. Br. 13–14.) Also, BMW asserts that 740,102 of the 1,086,234 BMWs sold or leased in the relevant years came equipped with Bridgestone tires, and that the 196 customer contacts it received referring to Bridgestone tires therefore relate to less than three one-hundredths of a percent of all BMW vehicles sold or leased between 2006 and 2009 that were equipped with run-flat tires. (*Id.* at 14.)

Addressing the parties' arguments, the Court finds that the ratio of complaining customers to cars purchased is irrelevant. What matters is that 196 of the complaints BMW received related to Bridgestone run-flat tires, and that this number is significantly more than the 40-member class baseline suggested in *Stewart*. Based on the number of total BMWs sold with run-flat tires, the number of complaints BMW and its dealers have received, and the number of claims submitted to the road hazard warranty programs, this Court can reasonably estimate that the class is sufficiently numerous to satisfy Rule 23(a)(1).

As for the New Jersey sub-class, the defendants argue that Marcus has provided little evidence of numerosity. In particular, the Bridgestone defendants point out that Marcus

submitted direct evidence of 29 BMW customer contacts, of which four involve New Jersey

residents, and only two refer to Bridgestone run-flats.  (Bridgestone Class Certif. Br. 23.)

However, the 29 customer contacts provided are only a small sample of the nearly 600 BMW

received, and it is common sense that there will be more members of the class than the number

of consumers who complained—probably significantly more.  Though the defendants are correct

that the exact number of members of the New Jersey sub-class is unknown, common sense

indicates there will be at least 40.  *See Lloyd*, 121 F.R.D. at 249.  The Court therefore concludes

that Marcus has met the numerosity requirement for the New Jersey sub-class.

### ii. Commonality

The commonality requirement of Rule 23(a) "is not a high bar," *Chiang v. Veneman*, 385

F.3d 256, 265 (3d Cir. 2004), and is met if the plaintiff establishes that the "'named plaintiff[]

share[s] at least one question of fact or law with the grievances of the prospective class.'"

*Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 184 (3d Cir. 2001) (quoting *In re

Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 310 (3d Cir.1998)).  The facts or

claims asserted by the various class members need not be identical.  *Id.*  Thus, satisfaction of this

requirement is usually simple.  *In re Ikon Office Solutions, Inc.*, 191 F.R.D. 457, 463 (E.D. Pa.

2000) (citing *Baby Neal, for and by Kanter v. Casey* 43 F.3d 48, 56 (3d Cir. 1994)).

The defendants challenge whether Marcus has established commonality on three fronts.[1]

First, they argue that the two tires Marcus preserved were damaged by a "nail or large metal

object that would have destroyed any tire," and that because the tires were not damaged by a

defect, the evidence needed to establish his claim is not common to the rest of the class.

(Bridgestone Class Certif. Br. 25.)  Second, the defendants state that while Marcus was

---

[1] Only the Bridgestone defendants challenge Marcus's ability to meet the commonality
requirement.  BMW's brief does not analyze commonality.

uninterested in getting information about his new BMW, other class members researched and knew about the run-flat tires, and so their proofs will be different from his.  (*Id.* at 26.)  Third, the defendants contend that some putative class members did not pay for their replacement tires because they bought tire insurance, returned their tires to Bridgestone while they were under warranty, or had their tires replaced by BMW as an act of goodwill.  (*Id.*)

Marcus states that his allegations relate only to the knowledge and actions of the defendants, not the class members, and so the proofs will be common to all class members.  (Pl.'s Class Certif. Brief 18.)  *See In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46, 70 (D.N.J. 2009).  According to Marcus, proving his claims and those of the class involves establishing that the tires are highly susceptible to road damage, unrepairable, and overly expensive, that conventional radial tires cannot be used with BMWs because the cars are designed only to accommodate run-flats, and that the defendants knew these problems existed and failed to disclose them to the class.  (Pl.'s Class Certif. Brief 18.)

The defendants' arguments appear to challenge Marcus's ability to win on the merits as the basis for denying class certification.  But despite *Hydrogen Peroxide*'s directive that a court engage in a rigorous analysis, establishing that a claim is meritorious is not a prerequisite to class certification.  *Sirota*, 673 F.2d at 571.  Marcus's burden is to establish that there is at least one issue of fact or law in common amongst class members.  *Johnston*, 265 F.3d at 184.  To that end, he intends to offer evidence that is contained in the defendants' own documents to show that the defendants knew there were problems with Bridgestone's run-flat tires, specifically that they were costly and difficult to repair.  (Oral Argument Tr. 102:18–103:9; Kurtz Decl., Ex. 2, at 27; Kurtz Decl., Ex. 8, at 2–3, 6–7.)  He will also offer Gold's expert testimony that all Bridgestone run-flat tires, regardless of model, are substantially similar.  (Kurtz. Decl., Ex. 15, at 6.)

7

Inasmuch as both he and the rest of the class members will seek to prove that the defendants

failed to disclose their products' deficiencies, Marcus has carried his burden.

### iii. Typicality

The typicality analysis is often woven into and merged with the commonality analysis,

*Baby Neal*, 43 F.3d at 56, but they are distinct. *Id.* The typicality requirement ensures that

representative plaintiffs are sufficiently similar to the other members of the class in terms of

legal claims and factual circumstances. *In re Schering Plough Corp. ERISA Litigation*, 589 F.3d

585, 600 (3d Cir. 2009). However, "even relatively pronounced factual differences will

generally not preclude a finding of typicality where there is a strong similarity of legal theories."

*Baby Neal*, 43 F.3d at 58. The typicality requirement is concerned with preventing conflicts of

interest between named plaintiffs and class members. *In re Hydrogen Peroxide Antitrust Litig.*,

240 F.R.D. 163, 169 (E.D. Pa. 2007), *vacated and remanded on other grounds*, 552 F.3d 305 (3d

Cir. 2008). Therefore, even where there are some factual differences, if the named plaintiff's

claim arises from the same course of conduct from which the other class members' claims arise,

typicality is established. *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006).

Marcus states that both he and the class members purchased or leased model year 2006–

2009 BMW vehicles equipped with run-flat tires, and that he and the class members were all

harmed by the defendants' purportedly insufficient disclosures. According to Marcus, he was

not told that the tires were susceptible to road hazard damage and expensive to replace, and

neither were the other class members. In addition, Marcus states that he and members of the

class suffered multiple flat tires early in their ownership of their BMWs. (Pl's Class Certif. Br.

at 20.) Marcus further contends that his implied warranty of merchantability claim is typical of

the class members' claims because the tires' defects render them unsuited to their intended

purpose and because the evidence will prove this without regard to the model of tire or vehicle. (*Id.*)  In fact, Gold's expert testimony opines that all of Bridgestone's run-flat tires are substantially similar, irrespective of model.  Marcus also states that his breach of express warranty, contract, and consumer fraud claims are typical of the claims of the class because the defendants' misrepresentations and omissions were the same for all of Bridgestone's tires.  *See Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 544 (D.N.J. 1999) ("The fact that a class member may have a claim concerning a product that no named plaintiff purchased 'does not detract from [their] ability to fairly represent the interests of the absent class members' because they would assert that such products suffer from the identical false representations.").

The defendants merge their typicality arguments with their commonality arguments. They state that Marcus is not typical because (1) his flat tires were caused by objects that would have destroyed any tire, run-flat or conventional; (2) he is subject, as a New York resident, to defenses based on privity that are not applicable to the New Jersey class; (3) he did no research and many class members did; and (4) he never encountered some of the problems he alleges, such as delays in getting replacement tires.  (Bridgestone Class Certif. Br. 25–27; BMW Class Certif. Br. 16.)  BMW also asserts that the class members bought various different models of BMW equipped with various kinds of tires, and Marcus only leased one model of BMW with one kind of Bridgestone run-flat tire.  (BMW Class Certif. Br. 17.)  BMW cites cases from California and New York stating that a class representative was not typical where he or she bought a different product from those at issue in the case.  (BMW Opp'n Br. at 17 (citing *Weiner v. Dannon Co.*, 255 F.R.D. 658, 666 (C.D. Cal. 2009); *Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 621–22 (S.D. Cal. 2007); *Lewis Tree Serv. Inc. v. Lucent Techs. Inc.*, 211 F.R.D.

228, 232–34 (S.D.N.Y. 1999); *Kaczmarek v. Int'l Bus. Machs. Corp.*, 186 F.R.D. 307, 313 (S.D.N.Y. 1999)).

The cases cited by the defendant are inapposite. Courts in this district have held that a plaintiff can establish typicality even where class members have bought products that differ from products the plaintiff bought. *See, e.g.*, *Cannon, Inc.*, 184 F.R.D. at 544. What is crucial to the typicality analysis here is that Marcus and the class members purportedly suffered harm from the same alleged course of conduct: the defendants failed to disclose defects in their products, misrepresented or omitted important information about the products, and made promises about the products that were not true. To convince a fact finder that the defendants actually engaged in this course of action, Marcus and the class members will have to offer substantially similar, if not identical, proofs about the defendants' awareness of problems with run-flat tires, and whether the defendants did or did not disclose material information. Therefore, Marcus has established typicality.

### iv. Adequacy

A court's analysis of whether a plaintiff adequately represents a putative class consists of two inquiries: first, whether the plaintiff's attorney is qualified, experienced and able to conduct the litigation, and second, whether the plaintiff has any interests antagonistic to the interests of the class. *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). Only BMW challenges Marcus's adequacy, and only to say that Marcus is not adequate because he is not typical. However, as Marcus states, the law firms representing him have sufficient experience. (Pl.'s Class Certif. Br. 21; Kurtz Decl., Ex. 43.) The defendants have offered no reason why the Court should find Marcus inadequate, other than stating that he is not typical. Having rejected that argument, the Court finds that Marcus is an adequate representative.

**B. Rule 23(b)(3)**

In addition to establishing that a putative class meets all of the requirements of Rule 23(a), a plaintiff must also establish that the class is one of the types provided for in Rule 23(b). *Hydrogen Peroxide*, 552 F.3d at 309 n.6.  Marcus here only seeks certification under Rule 23(b)(3), which demands a two-pronged analysis.  The first prong requires that "questions of law or fact common to class members predominate over any questions affecting only individual members . . . ."  Fed. R. Civ. P. 23(b)(3).  The second requires ". . . that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Id.*  These prongs are referred to as "predominance" and "superiority."  *Hydrogen Peroxide*, 552 F.3d at 310.

### i. Predominance

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997).  This standard is "far more demanding" than the commonality requirement under Rule 23(a).  *Hydrogen Peroxide*, 552 F.3d at 311 (quoting Amchem Prods. v. Windsor, 521 U.S. 591, 623–24 (1997)).  Rather than requiring a mere common claim, "'[i]ssues common to the class must predominate over individual issues.'"  *Id.* (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 313-14 (3d Cir. 1998)).  "Because the 'nature of the evidence that will suffice to resolve a question determines whether the question is common or individual,' 'a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.'"  *Id.* (citations omitted).  "'If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable.'"  *Id.* (quoting *Newton v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.*, 259 F.3d 154, 166, 167 (3d Cir. 2001)).  Accordingly, the Court will analyze the elements of each of Marcus's claims separately.

### a. Magnuson-Moss Warranty Act Claims

It appears that no federal court has certified a nationwide class under the MMWA on the basis of breaches of warranties related to defective products.  At least two courts have certified nationwide classes under the MMWA solely for the purposes of settlement, but one court conducted only a cursory analysis of predominance and the other did not analyze predominance at all.  *See McGee v. Cont'l Tire N. Am., Inc.*, 2009 U.S. Dist. LEXIS 17199 (D.N.J. March 4, 2009); *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292 (S.D. Fla. 2007).  The primary reason courts have been reluctant to certify nationwide classes under the MMWA is that the statute does not itself provide any substantive law, but rather imports state law on implied and express warranties.  *Cooper v. Samsung Elecs. Am., Inc.*, 2008 U.S. Dist. LEXIS 75810, at *18–19 (D.N.J. September 29, 2008).  A few cases from the District of New Jersey are illustrative.

In *Payne v. FujiFilm U.S.A., Inc.*, Payne brought a putative class action on behalf of "all purchasers or owners in the United States of Fujifilm FinePix 3800 digital cameras, designed, manufactured, marketed, distributed or sold by Fujifilm since 2002," asserting breach of express and implied warranties, damages under the MMWA, violation of the NJCFA, breach of contract, and breach of the implied covenant of good faith and fair dealing.  2010 WL 2342388, at *1 (D.N.J. May 28, 2010) (Brown, J.).  Considering Payne's MMWA and contract-based claims together, the court first determined which law to apply to Payne's claims applying New Jersey's choice-of-law rules, as required, *id.* at *6, 9.

New Jersey employs the most significant relationship test to determine which state's substantive law applies.  *Id.* at *9.  The court found that there are significant conflicts among the

state warranty and contract laws, and that each class members' home state had the most

significant relationship with the plaintiffs' contract claims. *Id.* at *9, 10.  The court then

determined that the court would have to apply the law of all 50 states to the class members'

claims, and that the plaintiff had not carried his burden of demonstrating a manageable way for

the court to do so. *Id.* at *10.  The court determined that common issues of law did not

predominate over individual issues, and therefore denied class certification. *Id.* at *11.

The court in *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 450 (D.N.J. 1998) (Lifland, J.),

reached a nearly identical conclusion.  In that case, the plaintiffs alleged defects in the anti-lock

braking systems included in Chrysler vehicles in model years 1989–1993.  They brought claims

for fraud and breach of express and implied warranties and sought certification of a class defined

as all United States residents who "own or lease a vehicle sold or manufactured by Chrysler

which is equipped with [the] anti-lock brake system; or . . . previously owned or leased such

Defective Vehicles and have incurred expenses arising from the repair or replacement of

defective . . . ABS systems." *Id.* at 451.  Before engaging in the same choice-of-law analysis as

the *Payne* court, Judge Lifland noted that in order to certify a nationwide class in which the law

of 50 states must be identified and applied, the plaintiff must "'credibly demonstrate, through an

extensive analysis of state law variances, that class certification does not present insuperable

obstacles.'" *Id.* at 453 (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986)

(internal quotation marks omitted)).  Judge Lifland then stressed that merely applying the law of

New Jersey to the case was insufficient because application of the choice-of-law rules is a part of

constitutionally mandated due process. *Id.* at 457 ("The parties before this Court have a due

process right to have their claims governed by the state law applicable to their dispute.").  In

denying certification of the class, the court further noted that the only cases granting certification

of a class to which the law of 50 states applied were settlements where a rigorous predominance analysis was unnecessary.  *Id.* at 459.

Finally, in *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 338 (D.N.J. 1997) (Simandle, J.), the plaintiffs alleged that certain of Ford's ignition switches were defective and that by including them in its vehicles, Ford violated state consumer fraud statutes and breached express and implied warranties.  Judge Simandle stressed that "[w]here the source of law derives from the law of the 50 states, as opposed to a unitary federal cause of action . . . differences in state law will 'compound the[] disparities' among class members from different states."  *Id.* at 340 (quoting *Amchem Prods.*, 521 U.S. at 624).  While he noted that "the existence of state law variations is not alone sufficient to preclude class certification," he concluded that certification was improper because the plaintiffs had presented no plan to manage the application of 50 or more state laws.  *Id.* at 349–50.

Considering the foregoing, this Court must determine whether Marcus has demonstrated the predominance of common issues of law sufficient to certify a nationwide class under the MMWA.  The first step in the analysis is to determine what law to apply to the class members' claims; this requires application of New Jersey's choice-of-law rules (i.e., the significant relationship test) because this Court must apply the choice-of-law rules of the forum state. *Payne*, 2010 WL 2342388, at *6, 9.  The first prong of the two-pronged test requires an examination of the applicable laws to determine whether an actual conflict exists.  *Id.* at *6.  If a conflict does not exist, the court applies the law of the forum state, but if there is a conflict, the court must move on to the second prong, which requires that the court "'weigh the factors enumerated in the Restatement section corresponding to the Plaintiffs' cause of action.'"  *Id.* (quoting *Agostino Quest Diagnostics Inc.*, 256 F.R.D. 437, 462 (D.N.J. 2009)).  Courts have

14

recognized that genuine conflicts exist with regard to breach of implied and express warranty laws. *Id.*; *Chin*, 182 F.R.D. at 460; *Cole v. GMC*, 484 F.3d 717, 726 (5th Cir. 2007).  Indeed, Marcus recognizes that such conflicts exist.[2]  (Pl.'s Class Certif. Br. 27.)

Under the second prong of New Jersey's most significant relationship test, the Court must apply Section 188 of the Restatement (Second) of Conflict of Laws to the class members' MMWA claims.  *Payne*, 2010 WL 2342388 at *10; *Agostino*, 256 F.R.D. at 464.  The Court must consider the following factors: "(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties."  *Payne*, 2010 WL 2342388 at *10 (quoting *Agostino*, 256 F.R.D. at 464) (internal quotation marks omitted).

Marcus argues that the first, third, and fifth factors militate in his favor because the place of contract and the place of performance is both the consumer's home state and the state where BMW is located, *i.e.*, New Jersey, and because BMW's place of business is New Jersey.  (Pl.'s Class Certif. Br. 27–29.)  However, he admits that "the location of the subject matter of the contract" appears to be the states in which the vehicles are operated, and he sidesteps the question of the place of negotiation by contending that BMW's leases are contracts of adhesion, so no negotiation took place.  (*Id.*)  Marcus also notes only briefly that the Bridgestone defendants are not located in New Jersey.  (*Id.*)

The defendants criticize Marcus's choice-of-law analysis as perfunctory and inadequate. The Bridgestone defendants point out that Marcus conducted no analysis as to them.  BMW

---

[2] Marcus's concession applies only to his MMWA claims.  His breach of contract claims, breach of express and implied warranty claims, and breach of the covenant of good faith and fair dealing claims are all limited to the New Jersey sub-class.

stresses that it is the plaintiff's burden to perform an extensive choice-of-law analysis, and argues that he has not done so.  Furthermore, BMW criticizes the fact that Marcus bases his choice-of-law analysis not on a contract with BMW or the Bridgestone defendants, but on his lease with BMW Financial Services, which is not a party to this action.

Marcus's analysis of the five "most significant relationship" factors is unpersuasive. He baldly asserts that the place of contracting and the place of performance both automatically include New Jersey because BMW Financial Services is located there.  But as the defendants point out, it is highly unlikely that all of the putative class members financed their vehicles through BMW Financial, as opposed to financing them through another bank or financial institution, and Marcus has not provided any evidence to the contrary.  Marcus's discussion of the second factor, place of negotiation, is weak.  He claims that all of BMW's leases are contracts of adhesion; this ignores the fact that car buyers often negotiate the terms of their leases to secure themselves a better deal. Marcus concedes that the location of the subject matter of the contract is the state in which each vehicle is operated.  Finally, with regard to the domicile, residence, nationality, place of incorporation and place of business of the parties, Marcus provides no argument for why the Bridgestone defendants should be subject to New Jersey law under his MMWA claim, and he fails to account for the fact that the class members should be considered when examining the domicile or residence of the parties.  *Ford Motor*, 174 F.R.D. at 348.  Indeed, each state in which a class member resides "has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws.  These interests arise by virtue of each state being the place in which plaintiffs reside, or the place in which plaintiffs bought and used their allegedly defective vehicles or the place where plaintiffs' alleged damages occurred."  *Id.*

Based on the foregoing, it is likely that the Court would have to apply the laws of all 50 states to the class members' claims.  It again merits mentioning that when considering whether to certify a nationwide class under the MMWA, no federal court has ever concluded that the forum state had the most significant relationship with every class member's claim.  Marcus has provided no plan for how the Court could manage the task of applying 50 states' laws. Therefore, common issues of law do not predominate, and certification of Marcus's MMWA claims is denied.

### b. The New Jersey Sub-Class Claims

Marcus asserts the remainder of his claims—violations of the NJCFA, breach of express warranty, breach of the implied warranty of merchantability, breach of contract, and breach of the implied covenant of good faith and fair dealing—only on behalf of the New Jersey sub-class. The defendants challenge the certification of these claims primarily on the grounds that common issues of fact do not predominate.  Initially, the Court must find some balance between the defendants' merits arguments and their arguments against class certification.

At oral argument, the defendants stressed their legal theory, which can be summarized as follows: Marcus is incapable of proving there is a defect in the tires, and because he is incapable of offering such proof, there is no way for the class to establish the defendants' liability through common proofs.  (Oral Argument Tr. 62:15–17, 82:1–11.)  Without proof of a defect, the defendants say, Marcus's claims can only be established by an individual examination of every run-flat tire that has been replaced in the past five years.  (Oral Argument Tr. 62:15–17, 82:1–11.)

As with the defendants' commonality argument, this theory straddles the line between class certification and the merits of Marcus's claims.  Because predominance is a more

demanding standard than commonality, *Hydrogen Peroxide*, 552 F.3d at 311, the Court must revisit *Hydrogen Peroxide*'s discussion of how a court may or must address the merits at the class certification stage.  While a court weighing a class certification motion must "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case," the plaintiff's burden at the class certification stage is not to prove the elements of a claim, but to show that the elements are capable of being established by common proof.  *Hydrogen Peroxide*, 552 F.3d at 311 (quoting *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir.2008)) (internal quotation marks omitted).  The Third Circuit stated that "the court's rigorous analysis *may* include a preliminary inquiry into the merits, and the court *may* consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take," and added that a court's findings at the class certification stage are not binding on the fact finder on the merits.  *Id.* at 317–18 (emphasis added) (internal quotation marks and citations omitted).  In sum, *Hydrogen Peroxide* instructs that the defendants' merits arguments, though they may ultimately be successful at trial, are not definitive here.  The Court's role is not to determine which side will prevail on the merits, but to determine if the putative class could prevail on the merits using common proofs.  With this in mind, the Court addresses Marcus's claims.

### 1. New Jersey Consumer Fraud Act

Marcus asserts claims on behalf of the New Jersey sub-class under the NJCFA.  The defendants argue that certification is improper on these claims because common issues of fact do not predominate.

To certify his NJCFA claim, Marcus must establish (1) unlawful conduct, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the

18

ascertainable loss.  *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009); *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 389 (2007).  The defendants contend that the class members cannot establish these elements with common proof, but that evidence will be required to prove what representations were made to each class member, the amount of each member's loss (if they lost anything at all), and what the cause of each member's tire damage was.  Marcus counters that the unlawful conduct can be proven with reference to the defendants' conduct, that the ascertainable loss is the greater of either the cost of replacement tires or the cost of road hazard coverage, and that causation may be presumed.

Under the first element, a plaintiff must establish that the "defendant engaged in deception, fraud, false pretense, false promise, or misrepresentation," but need not establish either intent or detrimental reliance on the misrepresentation.  *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 605-08 (1997).  The plaintiffs, therefore, can satisfy this element by establishing the conduct the defendants engaged in.  Marcus responds to the defendants' claim that no defect exists—and therefore there was nothing to misrepresent—by offering the defendants' own documents, which state that the most common complaints BMW and Bridgestone received about the tires were that they were expensive, difficult to replace, and nearly impossible to repair.  The documents also show that the defendants recognized that there was no future for run-flat tires without some change in strategy.  These documents demonstrate that the class members can establish, using common proofs, what the defendants knew about run-flat tires and what they withheld from customers.

The second NJCFA element requires that the plaintiff suffer an ascertainable loss, which means "either an out-of-pocket loss or a demonstration of loss in value" that is "quantifiable or measurable."  *Thiedemann v. Mercedes-Benz U.S.A., LLC*, 183 N.J. 234, 248, 872 A.2d 783,

792–93 (N.J. 2005).  The plaintiff must have bought a product and received something "less than what had been promised." *Int'l Union of Operating Eng'rs Local #68*, 384 N.J. Super. at 291. The defendants argue that BMW purchasers who obtained insurance for their tires or were provided free replacement tires presumably paid nothing for their tires, and distinguishing these people from the purchasers who paid full price for their new tires will require looking at each customer's warranty claims, insurance claims, and maintenance histories.  The relevant issue, however, is whether the class members got less than what they expected.  *Id.*  As noted above, Marcus has adduced evidence that supports the claim that the defendants provided a defective product and failed to disclose problems with the product.  If Marcus demonstrates that a defect existed, he will have shown that the class members got less than they expected.  The class can establish ascertainable loss with common proofs.

The final NJCFA element is also the most hotly contested.  To establish causation, a plaintiff must demonstrate "a causal nexus between the alleged act of consumer fraud and the damages sustained." *Int'l Union of Operating Eng'rs Local #68*, 192 N.J. at 392.  While the defendants state that Marcus must demonstrate reliance, Marcus claims that such reliance may be presumed.  The resolution of this debate is critical.  If the class must prove causation as to each member, the class will have to provide evidence that each individual member bought his or her BMW vehicle based on BMW and Bridgestone's touting the benefits of run-flat tires.

Generally, under the NJCFA, a plaintiff must "'prove that the unlawful consumer fraud caused his loss.'" *Cannon v. Cherry Hill Toyota, Inc.*, 161 F. Supp. 2d 362, 373 (D.N.J.2001) (quoting *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 23, 647 (1994)).  However, the statute does not require that a plaintiff actually rely on the unlawful conduct.  *Int'l Union of Operating Eng'rs Local #68*, 192 N.J. at 391.  The NJCFA therefore places a lower burden on its plaintiffs

than the common law of fraud does.  *Debrah F. Fink, D.M.D., MS, PC v. Ricoh Corp.*, 365 N.J.

Super. 520, 541 (Law Div. 2003).  Further, several courts have held that in some instances, an

NJCFA claim may stand without specific proof of causation.  *See, e.g.*, *Indian Brand Farms, Inc.*

*v. Novartis Crop Prot., Inc.*, 617 F.3d 207, 219 (3d Cir. 2010) ("While the required 'causal

relationship' may be shown under some circumstances without evidence that would satisfy the

reliance requirement of common law fraud, evidence of the kind of indirect reliance which

satisfies the common law requirement would clearly satisfy the causal relationship requirement

of the NJCFA.")  In instances where the defendant is alleged to have omitted material

information, courts have found that causation may be presumed.  *Varacallo v. Mass. Mutual Life*

*Ins. Co.*, 332 N.J. Super. 31, 50 (App. Div. 2000) ("The presumption or inference of reliance and

causation, where omissions of material fact are common to the class, has been extended in the

context of both common law and statutory fraud. . . . [I]f the plaintiffs . . . establish the core issue

of liability, they will be entitled to a presumption of reliance and/or causation."); *Mercedes-Benz*

*Tele Aid Contract Litig.*, 257 F.R.D. 46, 74 (D.N.J. 2009), *modified by* 267 F.R.D. 113 (D.N.J.

2010).

         Some cases, on the other hand, have required that the plaintiff affirmatively demonstrate

that the unlawful conduct caused her loss, even in the context of omissions.  *See, e.g.*,

*Stephenson v. Bell Atlantic Co.*, 177 F.R.D. 279, 290 (D.N.J. 1997); *Carroll v. Cellco*

*Partnership*, 313 N.J. Super. 488, 502–03 (App. Div. 1998).  But these cases are distinguishable;

both *Stephenson* and *Carroll* turned on the fact that the defendants made oral representations to

each class member prior to purchase.  *See Stephenson*, 177 F.R.D. at 292–93; *Carroll*, 313 N.J.

Super. at 503; *see also Hannan v. Weichert S. Jersey, Inc.*, 2007 WL 1468643, at *10 (N.J.

Super. Ct. App. Div. 2007) (presumption of causation does not apply where the fraud involves

oral misrepresentations).  In contrast, in cases like *Varacallo* and others, the misrepresentations made were uniform across the class.  *See Hannan*, 2007 WL 1468643, at *10.  Likewise, Marcus's claim here is that the defendants' marketing statements, as described in the evidence Marcus offers, did not differ from one class member to another.  (Oral Argument Tr. 15:14–15.) For this reason, the presumption of causation should apply.  Because the presumption applies, common issues of fact will predominate on Marcus's NJCFA claims.

### 2. Marcus's Common Law Claims

Marcus's remaining claims on behalf of the New Jersey sub-class include claims of breach of express and implied warranties, breach of contract, and breach of the covenant of good faith and fair dealing.  The analysis of whether common issues of law predominate tracks the MMWA analysis above, but is altered by the fact that the New Jersey sub-class is limited to those who bought or leased their BMW vehicles in New Jersey.

The defendants argue that the Court may be required to apply the law of several states, even with regard to the New Jersey sub-class, because some non-New Jersey residents may have bought their BMW vehicles in New Jersey, and their home states will have the most significant relationship to their common law contract and warranty claims.  Indeed, Marcus himself falls into this category as a New York resident.  However, individual issues need not be non-existent. *Ford Motor*, 174 F.R.D. at 340.  The key is that the individual issues be manageable in a single class action.  *Id.*  Because the sub-class is defined in terms of BMW purchases occurring in New Jersey, New Jersey law will predominate.  For all members of the sub-class, the place of contracting and the place of performance is New Jersey, and for many of the purchasers, the place of negotiation will also be New Jersey, even for those who do not reside in New Jersey. *See Agostino*, 256 F.R.D. at 464.  In addition, BMW is based in New Jersey, and it is likely that

many of the purchasers will be New Jersey domiciliaries or residents, as well.  *See id.*  Therefore,

for a significant portion of the sub-class, New Jersey law will apply.

      As noted above in the Court's analysis of the national class, where state common law is

involved in a class action in which the class includes citizens of different states, the court will

ordinarily have to apply the law of multiple states.  The existence of state law variations,

however, is not enough, in and of itself, to defeat class certification.  *Ford Motor*, 174 F.R.D. at

349 (citing *In re School Asbestos Litig.*, 789 F.2d 996, 1011 (3d Cir. 1986)).  Focusing on

whether applying the law of several states to the claims of the sub-class will be manageable, the

Court reiterates that its determination that individual issues of law predominate as to the national

class is based on the large number of far-flung class members whose own states' laws will apply

to their claims.  The New Jersey sub-class is much smaller and, therefore, more manageable.

Any variations in state law can be addressed by further dividing the sub-class, *see Wilson v.

County of Gloucester*, 256 F.R.D. 479, 489 n.15 (D.N.J. 2009), or by fashioning jury instructions

as to each relevant state law.  *Prudential*, 962 F.Supp. at 525.  Also, manageability difficulties

serve as less of an impediment to certification in cases where no practical alternative exists, *id.*,

and this is such a case.  *See infra* Part II.B.ii.  If manageability problems ultimately prove

overwhelming at trial, the Court has the ability to decertify the class.  *School Asbestos*, 789 F.2d

at 1011 ("We point out the critical fact that certification is conditional.  When, and if, the district

court is convinced that the litigation cannot be managed, decertification is proper."  (citing

*Payton v. Abbott Labs*, 100 F.R.D. 336 (D.Mass.1983))).

      The defendants also argue that class certification is improper on Marcus's state law

claims because common issues of fact do not predominate.  First, to prove a breach of the

implied warranty of merchantability, the plaintiff must establish "(1) that a merchant sold goods,

(2) which were not 'merchantable' at the time of sale, (3) injury and damages to the plaintiff or its property, (4) which were was caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of injury." *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 73690, at *29 (D.N.J. Sept. 3, 2008).  The defendants argue that establishing proximate cause, particularly in light of the fact that multiple models of cars and tires are involved, will require individual proofs, while Marcus counters, again referencing the defendants' documents concerning problems with the tires, that there is an abundance of information that the tires are defective and that his expert determined that all of the tires, regardless of tire or car model, are highly susceptible to road hazard damage.  Other judges in this District have concluded that merely proving a defect may require extensive examination of individual issues, both legal and factual, and "[e]ven where the alleged defect has manifested itself, individual issues of actual cause must be adjudicated."  *Chin*, 182 F.R.D. at 455; *Ford Motor*, 174 F.R.D. at 351.  However, in *Chin*, the plaintiffs failed to allege a common, class-wide defect.  Marcus here has offered evidence that because run-flat tires are, universally, substantially stiffer than conventional tires, they are therefore more susceptible to road hazard damage.  Such evidence makes it likely that common issues of proof will establish the class members' claims.

Next, the defendants challenge certification of Marcus's breach of express warranty claim because, they claim, individual proof will be required to establish that the warranty was the basis of the bargain for each class member's purchase of a BMW.  However, "no proof of the buyer's reliance on the warranty is necessary other than that the seller's statements were of a kind which naturally would induce the purchase."  *Bregman Screen & Lumber Co. v. Bechefsky*, 16 N.J. Super. 35, 41 (App.Div.1951).  And, as stated before, common proofs likely will suffice to

establish the existence of a defect.  Therefore, common proofs will likely establish the class

members' breach of express warranty claims.

Finally, the defendants challenge certification of Marcus's breach of contract and breach

of the covenant of good faith and fair dealing on the grounds that individual evidence will be

required to establish what disclosures the defendants made to each class member.  However, the

Berger report, which was commissioned by Bridgestone, notes that car salespeople rarely discuss

run-flat tires with customers.  (Kurtz Decl., Ex. 2, at 22.)  In addition, Marcus bases his claims

on the defendants' widespread promises regarding the quality and suitability of the run-flat tires.

This evidence suggests uniform conduct conducive to adjudication in a class action.  *Varacallo*,

332 N.J. Super. at 50–51.

For the foregoing reasons, common issues of fact and law predominate over individual

issues, and the predominance prong of Rule 23(b)(3) is satisfied.

### ii. Superiority

The defendants argue that a class action is not the superior method "for the fair and

efficient adjudication of the controversy" because Marcus has not set forth a plan for the Court to

make litigation manageable.  A court conducting a superiority analysis must consider the

following factors:

> (A) the interest of members of the class in individually controlling the prosecution
> or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already
> commenced by or against members of the class;
> (C) the desirability or undesirability of concentrating the litigation of the claims in
> the particular forum; and
> (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).  With respect to the first factor, while it is true that the mere fact that the

class members' individual claims are modest and separate suits are impracticable does not

automatically mean a class action is superior, *In re LifeUSA Holding, Inc.*, 242 F.3d 136, 148

n.13, it is nevertheless important to consider that where the individual claims are modest, a class

action may present the "only rational avenue of redress for many class members." *Prudential*,

148 F.3d at 316.  As to the second factor, none of the parties has presented evidence that this

controversy is being litigated elsewhere.  Under the third factor, the efficiency of adjudicating

the controversy in a single district militates in favor of a class action.  *Ford Motor*, 174 F.R.D. at

351.  Finally, the fact that common issues of law and fact predominate suggests that the case will

be manageable.  Furthermore, while the defendants argue that Marcus has not shown how to

identify putative class members, Marcus contends that he can do so by examining BMW's own

sales records, thereby ensuring the efficiency of the action.  Therefore, litigating this dispute as a

class action is superior to doing so in a number of individual lawsuits.

**III. The Defendants' Motion to Exclude Gold's Expert Opinions**

The defendants have moved jointly to exclude certain opinions of Charles G. Gold

("Gold"), Marcus's expert witness who opined on the similarity of the tires with which BMW's

vehicles are equipped.  The defendants state that Gold expressed the opinions that (1) extra

stiffness in Bridgestone run-flat tires "can make the tires more susceptible to road hazard damage

during normal use" and (2) all Bridgestone run-flat tires are "substantially similar in

construction" and therefore are all subject to the defect alleged.  (Moving Br. to Exclude Gold

Opinions 1.)  They assert that Gold had no basis for these opinions and conducted only a brief,

inadequate analysis before providing his opinion.  They state that Gold admitted he had no basis

for his opinions and that

> he (1) conducted no testing of any of the tires; (2) can identify no scientific
> studies to support his opinions; (3) cannot identify any peer review of his
> analysis; (4) cannot establish the rate of error for his methodology; and (5) cannot

show that his methodology is generally accepted by any relevant scientific community.

(*Id.* at 2.)  Marcus counters that Gold was only retained to opine that the Bridgestone tires are substantially similar, and not to give an opinion on whether the tires are more susceptible to road hazard damage or whether the tires have any particular defect.  (Opp'n Br. to Exclude Gold Opinions 13.)

The Third Circuit has a liberal standard of qualifying experts.  *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs. Inc.*, 546 F. Supp. 2d 155, 167 (D.N.J. 2008).  An expert witness may testify regarding technical or other specialized knowledge if it will assist the trier of fact, *United States v. Lee*, 339 F. App'x 153, 158 (3d Cir. 2009), so long as the testimony is relevant and reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  Under *Daubert*, a court must consider, among other factors, whether the theory can be tested, whether it has been subject to peer review and publication, whether it has been generally accepted, and the known or potential error rate.  *Daubert*, 509 U.S. at 593–95; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).  Under Third Circuit precedent, a court should also consider four additional factors: (5) the existence and maintenance of standards controlling the technique's operation; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994).

The defendants use a significant amount of space in their brief arguing that Gold has no reliable basis for his purported opinion that Bridgestone run-flat tires are susceptible to road hazard damage.  However, as Marcus points out, Gold was retained to offer the opinion that all Bridgestone run-flat tires are substantially similar in construction, and this is the opinion he gave

in his report.  (Kurtz. Decl., Ex. 15, at 6.)  The defendants contend that in his deposition, Gold conceded that the different Bridgestone tire varieties have different characteristics, such as different speed ratings, different load indexes, and different component materials.  They further argue that even the sidewall inserts themselves vary based on the tire model.  Moreover, they argue that Gold's opinion that all Bridgestone run-flats are substantially similar conflicts with the National Highway Traffic Safety Administration's definition of substantially similar with regard to tire recalls.  However, a court must not conflate the question of whether an expert's testimony is admissible with the question of whether the expert is credible.  *Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C. Cir. 1996).  Gold has been working with tires for the better part of 60 years. (Kurtz. Decl., Ex. 15, Gold C.V. at 1–2.)  In various capacities, he has investigated thousands of tire failures, accidents, and performance issues.  He has testified about tire specifications and problems in over 200 cases.  (Opp'n Br. to Exclude Gold Opinions 6.)  He is currently employed as a consultant providing tire expertise, and has been so employed for nearly 30 years; he also is or has been a member of numerous tire and automotive societies.  (Kurtz. Decl., Ex. 15, at 4.) Gold's research for his expert report included examination of thousands of pages of specifications relating to nearly three dozen Bridgestone tire models, as well as physical examinations of five separate tires.  (Opp'n Br. to Exclude Gold Opinions 6; Kurtz. Decl., Ex. 15, Gold C.V. at 1–2.)  Marcus has established Gold's substantial experience in the industry and the abundance of information he examined to prepare his report, supporting the conclusion that his expert opinion is sufficiently reliable to be admissible.

## IV. Marcus's Motion to Exclude Pettit's Expert Report and Testimony

For his part, Marcus has moved to exclude the expert report and testimony of William D. Pettit ("Pettit"), whom BMW retained to provide an opinion on BMW's marketing and customer

experiences.  Marcus contends that because Pettit based his report on his reading of newspaper articles, surveys, and a memo provided to him by BMW, his testimony is not "beyond the ken of the average juror," *Lasorsa v. Showboat: The Mardi Gras Casino*, 2009 U.S. Dist. LEXIS 81948, at \*14 (D.N.J. Sept. 9, 2009), and is therefore not admissible as expert testimony. Marcus also argues that because Pettit is a former BMW employee and still receives a pension from BMW, he is biased and his opinions are therefore inadmissible.

Marcus's bias argument can be disposed of quickly.  The defendants correctly state that bias is a topic more appropriately addressed on cross-examination.

> Assessing the potential bias of an expert witness, as distinguished from his or her specialized training or knowledge or the validity of the scientific underpinning for the expert's opinion, is a task that is properly left to the jury.  While an expert witness is always "subject to being discredited" on cross-examination, the jury must be free to weigh the credentials of the witness and the cogency of the bases given for his opinions if the expert has the requisite basis to testify on an issue of relevance. . . . Thus, considerations such as an expert witness's pecuniary interest in the outcome of a case, or his status as an expert witness only for one side of an issue . . . go to the probative weight of testimony, not its admissibility.

*Cruz-Vazquez v. Mennonite Gen. Hosp.*, 613 F.3d 54, 59 (1st Cir. 2010) (internal quotation marks and citations omitted).

Moving on to the remainder of Marcus's objections, the purpose of Fed. R. Evid. 702 is to make admissible testimony that can assist the trier of fact.  While the knowledge the expert possesses must be "specialized," "[t]o be 'specialized,' knowledge can be based on sufficient practical or work experience in the field about which the witness is testifying, and it need not be based on testing or experiments beyond common understanding."  *Lauria v. AMTRAK*, 145 F.3d 593, 599 (3d Cir. 1998).  At trial, BMW will seek to establish that any misrepresentations or omissions it committed were not material, and that it cannot be liable under the NJCFA.  *See. Leon v. Rite Aid Corp.*, 340 N.J. Super. 462, 469 (App. Div. 2001).  To that end, BMW seeks to

have Pettit opine about what BMW customers know about the specifications of their cars and what information they value when purchasing cars.  According to his report, Pettit spent 30 years with BMW conducting market and consumer research.  (Kurtz Decl., Ex. 48, at 1.)  He researched the amount of information about run-flat tires that is available to customers by searching for newspaper and Internet articles about the tires.  (*Id.* at 2.)  He also aggregated the information about run-flat tires provided to consumers by BMW itself.  (*Id.* at 3.)  He then compiled the results of a number of surveys and studies regarding the demographics, psychographics, and response to run-flat tires of BMW customers.  (*Id.* at 5–7.)  While Marcus is correct that most of the materials Pettit reviewed are publicly available, it is unlikely that the layperson would be as capable as Pettit of understanding what the information contained therein means.  In that regard, Pettit's many years of experience in the field of market research gives him specialized knowledge of consumer behaviors that will assist the trier of fact in this case.  Therefore, Pettit's expert opinion is admissible.

**V. Conclusion**

Based on the foregoing, certification of the nationwide class is **denied**.  Certification of the New Jersey sub-class is **granted** (D.E.144).  Marcus's motion to exclude Pettit's expert report (D.E.198) and the defendants' motion to exclude Gold's expert report (D.E.207) are both **denied**.  An appropriate order will be entered.


Dated:  November 19, 2010                                  /s/  Katharine S. Hayden

                                                          Katharine S. Hayden, U.S.D.J.